Thank you, Your Honors. May it please the Court, Jonathan Franklin representing the appellant Merck&Company, formerly known as Shearing Plough. I'd like to reserve four minutes for rebuttal. Yes, sir. Your Honors, this case involves a party that exercised its legal right to accomplish a real business and economic objective in a way that minimized its taxes, and in doing so, relied on a mandatory IRS directive. This is not a case like ACM and similar cases in which parties engaged in what were ultimately held to be insignificant transactions intended to create artificial deductions or phantom losses to offset against preexisting gains or vice versa. That's not what happened here. Shearing Plough had a real economic and business objective of obtaining financing for a stock buyback program and other activities, and to do that, it needed not to incur additional debt. It had a legal right to accomplish that business objective in a manner that was most tax-minimizing, in the most tax-efficient manner. And the way you would do that is to repatriate funds from one of your subsidiaries overseas? Well, they had different options that they considered, various different options, one of which is a bank loan. But the one that you considered is the one presented to you by Merrill Lynch. The option that they chose was the one that both served the business objective of obtaining the financing without incurring the debt, but also was tax-efficient. But it didn't have to involve a third party like these subsidiaries, did it? Yes, there were different ways that they could have done the financing. They could have gone to a bank, and that would not have had any tax implications. Well, they could even have used this scheme, couldn't they, and still not used subsidiaries, foreign subsidiaries? Well, if they didn't have the subsidiary, the money that they eventually got for the financing was the money that the subsidiaries had. So in that instance, that was the view that was the most tax-efficient method and also served its business objective. But there's nothing wrong with that, Your Honor. And I'll give you an example that we've used in the brief. If a homeowner wants to put an addition on their house, they have lots of different ways that they can finance that addition. They could have cash in the bank that they could use, or they could go and take out a mortgage. A mortgage would involve a lot of transaction costs. It would put a lien on their house. But they may choose the mortgage because that's the most tax-effective way of doing it. They get a tax deduction, and that's permissible. It's permissible because they're accomplishing a real objective, but they're doing it, as this court said, more than 60 years ago in Gilmore's estate. They're allowed to accomplish that objective even if it minimizes taxes. And the district court, I think one of the fundamental problems that it made, and I'm kind of skipping here to the economic substance area, but the court said we're not going to respect anything about this transaction because you had other ways you could have done it that were, you know, resulted in, as it turned out, a $500 million, half a billion dollar almost tax bill. Shearing Plow had the right to accomplish its objectives in a manner consistent with the law that was also tax-minimized. Can you explain why the half a billion dollars came from Shericho instead of coming from Limited, rather than having the money go from Limited to Shericho and then back to Shearing Plow? Half a billion was the tax bill, but obviously there was a lot of money that was coming forward. Really, the record doesn't show, Your Honor. The government has said that the reason most likely that was done was the potential availability of another tax benefit for something called previously taxed income. The important thing to know about that, the idea being that one of the – I don't quite follow. Was there anything to prevent you from getting the money directly from your subsidiary, Limited? No, no, Your Honor. I think that the government's position on that is that that was done to take advantage of a different tax benefit that involved something called previously taxed income. One of the subsidiaries had more of that than the other one. The important thing about that particular fact, Your Honor, is that that issue is just not in the case. The parties have stipulated that it doesn't matter which subsidiary advanced the benefit. This was a sale. You want us to conclude that this was a sale. Yes. And that when you got the assets from Sheriko, Sherry Plow got those assets. Sherry Plow then sold – Sherry Plow sold something to Sheriko. Yes, they sold a financial asset to Sheriko, which was called a – It was an account receivable. A swap receive leg. Okay. And it was the account receivable from ABN. They sold ABN's obligations under the swap – The receive legs. The receive legs. And the reason, of course, they did that is that the IRS had a specific directive, Notice 8921, that specified the exact accounting treatment for that particular kind of transaction. And the IRS itself recognized that Notice 8921 engendered legitimate reliance interest. When they changed the tax rule in 1993, they expressly decided to make it non-retroactive to transactions like Sherring Plow's that had been accomplished in reliance on the earlier rule. And then when they considered another taxpayer that had done exactly what Sherring Plow did, they concluded that Notice 8921 governed. And what the district court did improperly in our view – Maybe they were wrong the first time. Well, that's their argument now. And, of course, we have a separate claim based on unequal treatment. We don't think they were wrong. And I think that brings us to where I think the district court really made its fundamental errors. The district court effectively allowed the IRS to pull that rug out from under the taxpayer, Notice 8921, by recharacterizing the exact transaction that's covered by that notice, the sale of a swap-received leg. If they sell something to a subsidiary and they get a lot of cash, they sell it for the fair market value. It's an overseas subsidiary. There's no tax consequence. If the asset is not an investment in what's called a U.S. property, that's under subpart F of the tax code. This was not an investment in U.S. property. What happens if an American car manufacturer sells the cars it made here to its overseas subsidiary, which sells them in Germany or wherever? Is that a faxable transaction? They get cash back from the client. Your Honor, here I'm going to plead a little bit of ignorance. I know a lot of this. Subpart F is very complicated. There are exceptions. There are about ten exceptions. I think the National Association of Manufacturers brief lists a bunch of them to this investment in a U.S. obligation. I'm not sure if the sale of cars would be considered an investment in a U.S. obligation. An investment in U.S. property, which in this case involves a U.S. obligation. What I do know is the sale of a swap received leg that comes from ABN, a foreign bank, is not taxable under subpart F. I just wondered this. The reason ordinarily if your client went to an American bank or a consortium of banks and brought all this money and they got the cash in, there wouldn't be any tax consequence at that point. Not at all, Your Honor. The reason that there's a tax consequence here is that in effect they're borrowing the money from themselves by repatriating it. Is that the theory? I know you say that did not happen. That's the theory, Your Honor, is that the government knows that the sale of a swap received leg, which is not a U.S. obligation, is not taxable under subpart F. That's why they had to argue, and the district court accepted this, that it was in economic substance or in reality a loan. And that's where we think the district court really argued. So ordinarily a loan, though, would not be a taxable event. Ordinarily it would not. But in this very specific area involving controlled foreign corporations, a loan would be taxable. You also had a pay leg so that you were paying money to ABN. We were paying money to ABN. And just to finish the flow of money, ABN was then paying SHERCO. But not the same money, Your Honor. Not the same money. ABN, the swap obligations differed. Why wasn't that repayment of a loan? Because, first of all, there was no obligation, and this goes to the Geffman case, which we relied on, there was no enforceable obligation to repay the principal. The only thing that the subsidiaries had is what any purchaser of a swap received leg has. They had a right to receive a stream of income from ABN that was based on the multiplying a notional principal by a floating future interest rate that goes out 20 years into the future. That might or might not exceed the amount that was paid. I'm sorry. Did you say enforceable obligation? A legally enforceable obligation. That's the language of Geffman, Your Honor, several places in the Geffman opinion. And in that case the court did reverse a determination that had been made that a loan existed because there was no such legally enforceable obligation. The court used slightly different formulations during its opinion. So what test should we apply to determine whether this was a loan? Geffman, Your Honor, I think is if there either has to be at the time of the transfer of funds, and I will at this point try to read the exact language. I'm wondering if that's not form over substance. I mean, if it's not, it may not be a legally enforceable obligation, but it was an obligation. If the substance, Your Honor, is that there is a legally enforceable obligation, absolutely the substance can override the form. But here's where the district court made another mistake. The court said, I'm going to recharacterize this as a loan based on attributes that the court thought looked like loans, but attributes that are common to all assignments of swap received legs. Everybody who buys one of these assets, which is basically a right to receive income streams going out into the future, everyone who buys one of those things is going to get periodic payments, what the judge thought looked like loan. They're going to get those payments based on an interest rate, albeit one multiplied by. The payment was over a 20-year period? Well, the payment, they assigned the last 15 years, but the payment would stretch out 20 years into the future. Mr. Sherico is receiving for 15 to 20 years payments from ABN, which in turn was receiving payments from Shering Plow. Yeah, different payments, though, Your Honor. What does that mean, different payments? Because the swaps are different. One party pays at one interest rate. The other party pays at a different interest rate. So that's why, moving to the conduit issue, that's why there's no conduit here. What ABN was getting, let's just take the 91 swap. I know that some of this can be somewhat complicated, and I apologize. But take the 91 swap. You had Shering Plow, the parent, paying ABN based on what's called a LIBOR rate, which is the London Interbank Offered Rate. And then you had ABN paying the subsidiaries based on the federal funds rate. Those are different payments, and we've shown in the record here that those payments could differ sometimes by millions of dollars. On the 92 swap, by the way, the payments were hugely different. The 91 swap we have in the joint appendix. But the point there is that there was no flow of money. There's another aspect to this transaction, and given my lack of familiarity with anything this sophisticated, I'm wondering if it's common and whether it has any significance to whether or not this is a loan. And that is that in addition to the obligations and the streams that you've described between ABN, Shering Plow, and the subsidiaries, there are mirror swaps going on here too as between ABN and Merrill. Is that common? Yes, very common because those mirror swaps are hedges. So ABN, here's what happened. ABN took on a significant amount of interest. Well, that just means ABN is not going to lose. Right. ABN hedged its risk, but it had the risk. What it did is it transferred it out to Merrill Lynch. Well, characterize what that risk was. All right. There's three forms, Your Honor, but the one we're talking about now is what I would refer to as interest rate risk. All right. You've talked about it. They had the risk, what we just were discussing, that the payments coming in could be millions of dollars. Libor versus fed funds. Right. And if you look at the 92 swap, which was based on a commercial paper rate, the numbers were hugely different. ABN was actually losing a heck of a lot on that. But what they did is they mirrored that with Merrill Lynch, and what that did is it effectively – It just went the other way, didn't it? It went out. In a mirror image sense. It went out, though. It didn't go – it wasn't a mirror with Shering Plow. It was a mirror with another independent economic actor. With Merrill. Right. They ensured their risk. But the point here is that they had risk. They had interest rate risk in this transaction. What they did is they did something about it. And I'll give an example from the case law. Frank Lyon, which we've discussed in the brief, that's a conduit case where the Supreme Court said that the party who gets the sale under a sale lease back is not a conduit. Even though they're getting payments to service their mortgage, the rent is exactly equal to the amount that they need to service their mortgage. And the reason is because they took credit risk in doing that, that the renter might not pay them. If Frank Lyon went out and insured that risk with some sort of credit default insurance, which I'm not sure existed at that time, but assume it did, that wouldn't make them any more of a conduit. They're not a conduit because they're a real economic actor. They're taking risk. Now, in this case, ABN took the risk. It did something about it. That's one risk. The second risk it had that didn't make it a conduit is that it employed, just like in Frank Lyon, it employed its capital. So if I could interrupt. So I understand. So your point is the risk is no less a risk simply because someone buys a hedge. Absolutely. To take care of it. You could construct one of these things, and this was not done. I assume you can construct one of these things so that it's internally hedged, in which case, you know, Shearing Cloud would somehow be guaranteeing ABN, but they didn't do that. Was ABN also paid some fees? Yes. They were paid a fee by Merrill Lynch. Remember, Merrill Lynch didn't want to do this. The reason Merrill Lynch didn't want to do this, they didn't want to take the credit. Sure they had to be dragged kicking and screaming to do this transaction. No, they wanted to do the transaction. No question. They didn't want to be the credit. They didn't want to be ABN. And ABN, it turns out, didn't want to be ABN either. Actually, the record I read of the district court is that this relationship between ABN and Shearing Cloud was really just to establish a conduit for money to go from Shearing Cloud to ABN to then repay Cherico alone. Well, is it a finding of fact that's entitled to great deference? No, we don't think it's a finding of fact, Your Honor. We think that it rests on an improper legal understanding of what a conduit is. A conduit, the court really held, frankly, the court noted this in its opinion. A conduit is a pass-through. It's a shell. It's a non-entity. It's as if it doesn't exist. Why did that not happen here? Why did what not happen, Your Honor? I'm sorry. Why is this not a shell? In other words, why wasn't ABN nearly a conduit for Shearing Cloud to repay alone? Because they had, as the business people say, they had their own skin in the game here. They had serious interest rate risk that they then went out, as we discussed, did something about. They also had default risk from Shearing Cloud, which the court minimized. But they did have it. The court found that. And they also employed their capital. And this was a big problem for the bank because the bank was a regulated bank, and it had to reserve huge amounts of money to set aside based on this transaction. And what ABN learned, because they had this risk, because they had to keep paying the subsidiaries even if Shearing Cloud were to default. They put aside a lot of money, but they made a lot of money, too. I mean, they didn't do this out of the goodness of their heart. No way, Your Honor. They were an independent economic actor. They didn't do it out of the goodness of their heart. And they weren't a conduit. And the problem was is that they were using this capital for this transaction, and they couldn't use it for something else. And that's the language actually from the Supreme Court's decision in Frank Lyon. I think I took up a lot of your time. That's okay. Did Shearing Cloud get a deduction when it made the payments on its leg? Did Shearing Cloud? The money came in, and the IRS ruled it was taxable as a loan. Now, they had to make payments out, too. Right. Was that a tax-deductible payment? The payments were made out to ABN. I think they probably were, Your Honor, but I can ask my tax colleagues here who know more about that. I think they probably were deductible, Your Honor. But the big problem here is that they got close to $500 billion. Right. Whereas Notice 8921 says quite clearly that you can do this. And what the court, I think, candidly admitted in its opinion, was that it has rendered Notice 8921 effectively meaningless from its inception. And the way it did that is it re-characterized the exact transaction covered by the notice as something else, as a loan. I thought that the notice said that it didn't apply to a loan. That's right. Then why did it render it meaningless? Because the court used... It rendered it meaningless here. Because in characterizing it as a loan, the court relied on factors that are common to all assignments of swap-receive legs. All of those things that the court thought looked like loans exist whenever you buy one of these assets. The key thing that does not exist and what needs to exist for a loan is an enforceable legal obligation to repay the amount that was given. That didn't exist. And so I think what's happening here, Your Honor, is the IRS thinks, oh, Notice 8921 is a bad idea. Well, they had a chance to change that. They had a chance to change it in 1993, and they expressly did change it in 1993. But they said, look, we're not making this retroactive to transactions like these that were accomplished in reliance on the prior rule. What's the theory? You have a loan here, it's not enforceable, so A lends money to B, so this is a loan, but you only have to pay it back out of the goodness of your heart. Otherwise, is that a loan? No, I think Geffman would say it's not. Geffman, Your Honor, is more familiar with that decision than I am, I'm sure. But that case, as I read it, says that's not enough. There has to be an actual enforceable obligation. And here, importantly, what the subsidiaries had was what anybody who buys one of these things has. It's an investment. You buy it, you think you're going to make money on it, you hope you're going to make money on it, but it's dependent on what floating future interest rates are going to be like 20 years in the future. They don't have much choice, do they? I mean, sharing plows, subsidiary? Yes. They don't have much of a choice whether they're going to buy an asset or not? No. I mean, doesn't sharing a plow dictate, for the most part, what your subsidiary is going to do? Sure. And again, I keep coming back to that. So whether they view it as a nice deal or not, they're pretty much bound by it. But what they got was what they made sure was that it was fair market value. They went out and got a third-party appraisal from a bank, effectively. They sold part of the swap to a third-party bank to make sure that the value was correct. Subsidiaries bought them, but in Geffman, there was related parties. They were actually the same folks on both sides of the transaction. And what the court said is maybe we give that more scrutiny, but the standards are still the same. You still have to have the indicia of a loan. And here, we had none of that, but we do have exactly what a sale is. Okay. You bought one of these things. I know my time is up. Thank you, Mr. Franklin. Thank you. Ms. Hagling? Mr. Franklin went over quite a few minutes, so if you need more time, you'll let us know. Sorry, there's a lot of material in this case. Could you pick up on that unconditional legal enforceable requirement or unconditional condition, whatever, unconditional obligation? Sure, Your Honor. Requirement in order to have a loan. Right. And what this court said in Geffman is it didn't require, you know, there's not in this case one piece of paper where Schering-Powell said, we promise to pay back the subs. And that was not a requirement in the Geffman decision. Such a requirement wouldn't make sense in the context of this case because it's undisputed and the district court found Schering-Powell never had formal loan documentation for loans with its subs and between its subsidiaries. But what the court said in Geffman is that you can infer from all the surrounding evidence that there was an obligation to repay and an intent to recoup the debt. And you look at what the court in Geffman said is you look at evidence of the party's intent and the economic realities. And that's exactly the test that the court applied in this case, looked at all the evidence in the case, listened to all the witnesses and determined that the factual determination that Strips was in substance alone and based it on basically three things. One, the context and purpose of the transaction, the documentary evidence of the party's intent and the economic realities, in particular the expert testimony regarding the economic realities. And with regard to context and intent, what Merck tries to brush over is that this was not a sale of a pre-existing asset to an unrelated party. This was all part of a preconceived tax plan put together by Merrill Lynch using ABN as the accommodating party for the parent company here to acquire the subs funds. And the court found that in creating the swap, they back solved from how much money Shering-Powell wanted to repatriate. Why isn't it a sale? Are there requirements of a sale that have to be complied with that weren't? Or are you just saying it's a loan because that's the flow of money that you've been able to do? And it's the court found, I think, according to the MAPCO decision that when you're talking about a purported, whether a transfer of future income is a sale or a loan, that it's a narrow distinction. And what it comes down to is what did the parties intend? And the court found that there was numerous evidence of the party's intent in this case to create a loan, not a sale. You know, both parties. Did it matter that the asset sold, in effect, was created for the transaction? That's certainly part of it. I mean, that's inconsistent with something being a sale. It's more like a loan. They weren't selling by cars. That's correct. They were creating an asset that would repay over time the money that the subs had transferred to Shering-Powell. It was everybody's expectation that the swap that was engineered from the amount of money that the subs were going to transfer to Shering-Powell. Go ahead. Do you know the answer to the question I asked about when they pay the money back, do they get a tax deduction? If this were, as we characterized, a loan, yes. But it would be offsetting because Shering-Powell, I actually asked the IRS about this the other day, Shering-Powell would be able to deduct the payment of the loan, but the loan income that the subs received would be considered sub part F income that was immediately taxable, so they would offset each other, the interest income and the interest expense. Are there internal corporate requirements with respect to a transaction like this, whether you're going to call it a loan or whether it's a sale? That was one of the pieces of evidence that the court relied on before Shering-Powell entered into the 1991 STRIPS transaction, they had an investment policy. I'm sorry to cut you off, but you mentioned before there were no documents that really referred to this as a sale. Correct. No, I don't think there were any internal requirements for what you would have for a loan at Shering-Powell. I understand the district court also noted that a transaction like this would be presented to the board of directors. If this, in fact, were a true investment and, you know, a true swap investment and not a loan, Shering-Powell at the time of the first STRIPS transaction had a policy that you had to get board approval for investments that would last, as this was purported to, over 360 days. Well, it says this is an investment. Well, if it were, but they didn't get the board approval, and the testimony at trial was, yeah, you could, to view that as Shering-Powell did not really review this as a true investment. It was instead just an intercompany loan. The board was also told that the subs now had an asset that earned interest, and Shering-Powell conceded at trial that a loan is an asset that earns interest. Ms. Hagley. Yes. Notice 8921. You would acknowledge, would you not, that the aspects of the swap and assign transactions that we have here, at least on the face of it, meet the requirements or definition under that notice, do they not? Yes, it would, except that the notice also says that the notice had a limited purpose. If you have received lonesome payments and they're not a loan, then you can't treat it as income received in one year. You have to spread it out. So the face of the notice itself refers to lonesome payments could be a loan, and that's what we have here based on all the evidence that the court looked at, the economic realities, the purpose for which the asset was created, the contemporaneous intent. Did that answer your question? I think so. No. Taxpayer has talked about whether ABN can be considered a conduit or not, and as we argued to the court, and the court found, you don't need to find that ABN is a conduit to find that this was a loan transaction here, because there was testimony in the case, and what the court found is that you can have a three-party loan, and a three-party loan is a loan, so you wouldn't need to view ABN as a conduit, because even if it was an independent third party, and they were not an independent third party. That was the district court's decision. That's what the district court's decision. The district court found that this was a three-party loan, and then the court also found that you could view ABN as a conduit, and that would further support the court's loan determination, but it's not necessary to the court's loan determination. But the court's determination that ABN was a conduit is also factually correct. ABN is correctly disregarded for tax purposes. It's undisputed they were brought in by ABN to, I'm sorry, Merrill Lynch, as they had been in the ACM decision, to accommodate this particular tax strategy, and they experienced no material risk. You know, with the combination of the mirror swaps, and the credit trigger that were in the swap agreements, they had no material risk, and with regard to their risk. So your position is that the mirror swaps do have some significance here? Right. And this was all part of a, you know, this wasn't just a hedging. This was all part of a prearranged plan put together by Merrill Lynch that ABN would engage in swaps with Shering Plow and then offsetting mirror swaps with Merrill Lynch at the same time. So it really does become a nothing. They were just receiving their fee. But I understand Mr. Franklin's argument to be that the risk exists irrespective of whether or not ABN has the right to, and did in fact, as they did here, purchase mirror swaps. Well, the testimony of the trial was that the mirror swaps eliminated their interest rate risk. Well, they hedged, and they were intended to hedge. But they were exactly offsetting. So whatever Shering Plow would pay to ABN, ABN would pay to Merrill Lynch and receive back from Merrill Lynch what had to be paid to the subs on the received flags. Now, I understand that this asset was created solely for this purpose. Yes. In other words, solely to sell it to a subsidiary here in Syracuse. That's correct. Correct? That's correct. And the district court further found that there was no business purpose for the swaps whatsoever other than creating an asset that would return over time the funds to the subs that the subs had. There were two separate payments that were made from Sherico to Shering Plow? Two separate payments. In other words, two payments over two years? Right. One for the 1991 STRIPS transaction and one for the 1992 STRIPS transaction. Were there separate assets sold? There were separate payments. Well, the district court found there were separate loans. Separate payments for one asset. There was a notional swap transaction created in 1991. I think the notional amount was $650 million. And then there was a second what we've called STRIPS transaction that was entered into in 1992 on a different notional amount, and that was a separate loan. In this case, the court found there were two loans, one in 1991, one in 1992, and that both loans were essentially from, were in substance rather from Limited, not Sherico, that Shering Plow had just been running the funds through Sherico to Shering Plow to sort of disguise what was going on. As the court said, there was no explanation why, if this was truly a sale, why you would have to route the funds through Sherico instead of doing it directly from Limited. There was no response other than what was evident to the court. It was just further attempts to disguise the true substance of this transaction, similar to the fact that on its tax return, Shering Plow didn't let the court know, didn't let the IRS know that they had engaged in the assignments. Those were hidden. If it's a sale, how is it treated tax-wise? If it's a sale? If it was a sale. I know you say it wasn't. Right. If it had been, how would that be treated? Then it would be treated pursuant to 8921 of prorating that lump sum over time, over the 20-year period, starting in year five, year six, and going through year 20. Pay less taxes. Yes. But it would also have a basis for what you're selling. I mean, it wouldn't all be profit. I'm not sure about how the basis would work. No, but you'd have the use of money. You'd have more money that you could use over time. Eventually, you'd have to pay it off. That's right, and they would be making payments at the same time. But, again, that's the form of the transaction, not the substance, which is what the court found to be a loan. And Shering Plow has talked about its right to do tax planning, but it's well settled that legitimate tax planning doesn't involve engaging in transactions that lack economic substance or engaging in transactions where the substance does not match the form. And I'd like to point out that the United States is also entitled to tax planning, and part of the United States tax plan is that each taxpayer is. . . I'm not sure it's done a particularly good job. Well, try our best. But with the United States tax plan, each taxpayer is required to pay their fairest tax. Let me take you back to 8921, if I might, because I'm actually trying to get an understanding of some of Shering Plow's arguments with respect to the effect and the change. The service reversed course with respect to 8921, didn't it? No. 8921, as I said, had one purpose. If you have a lump sum and it is not a loan, this is how you account for it. It provided no guidance as to how you determine whether a lump sum payment is a loan or not. For that, you just look to general tax principles, like the MAPCO decision or the Geffman decision. It didn't weigh in. What the regulations said, which were in effect from 1993 and going forward, is that it did provide guidance on when a lump sum payment is going to be a loan, that significant non-periodic payments would be considered a loan if you had non-significant payments. Then the accounting, I think, was similar to what was set out in 8921. What about the disparate treatment argument that Mr. Franklin was referring to where a transaction somewhat similar was treated completely different and the taxpayer in that case was given the benefit of having the transaction called a sale? The Brunswick transaction? The Brunswick transaction. As we pointed out in brief, the question in the tax refund case is whether the taxpayer in that case owes the tax and how other taxpayers are treated is simply irrelevant to that question. With regard to Brunswick, if you look at the Brunswick FSA, what was going on there is the IRS didn't address the judicial doctrine. Just looked at the form of the transaction and said, okay, well, this is consistent with 8921. If you look at the FSA that was issued regarding sharing plow, the IRS noted that the applicability of the judicial doctrines precedes any consideration of forms. The only thing that's going on is that the IRS in that case, in the sharing plow case, had developed factual arguments that under the judicial doctrines the form of the transaction should not be respected and had just simply failed to do so in the Brunswick case. But the fact that the auditors did a terrific case in the sharing plow doesn't mean that sharing plow can escape their efforts by pointing the finger at another taxpayer. But there was nothing retroactive that was going on here because all that was applied to sharing plow were the preexisting, well-established judicial doctrines. Does the court have any further questions? I don't have any further questions. Thank you very much for your time. Thank you, Ms. Hagley. Mr. Franklin. Mr. Franklin. Thank you, Your Honors. The position of the IRS appears to be that sharing plow intended to create a loan. There cannot be any such intent to create a loan. Sharing plow knew that if it created a loan, it was going to be subject to what is now approaching $500 million worth of extra tax. They did everything to make sure that the form of this transaction was not a loan, that it was a sale, because that's what they wanted to do. They wanted to comply with Notice 8921. Judge Fuentes, you mentioned whether or not there were any documents that referred to this as a sale. All of the documents referred to this as a sale. There were no documents referring to this as a loan except for a few stray comments by accountants saying we're accounting for it that way. Every indicia here is exactly what the form is. The form was a sale, and the reason the form was a sale was sharing plow wanted very much to make sure that it complied with every letter of Notice 8921. And Ms. Hagley admitted that if it is a sale, and the district court found this too, then we are entitled to our refund because the IRS has a tax plan. The tax plan was in Notice 8921, and that plan said if you do this, this is how it will be treated. What about the idea that this asset was created solely for the purpose of this one transaction? There's nothing wrong with that, and I'll go back to my mortgage example, Your Honor. If I put an addition on my house, I am going to have a bank create a lien on my house. It's a form of property right that didn't exist before. The only reason that bank is putting a lien on my house in this hypothetical situation is because I want the tax benefit. I could probably put the addition on my house using my bank account, using my credit card, borrowing from Mom. I choose to put a lien on my house because that, under the tax laws, gives me a tax benefit. In this case, sharing plow chose to do this form of transaction because it would not be subject to subpart F, clearly wouldn't. By the way, Your Honor, on your car example, I'm told that that would not be an investment in U.S. property that was taxable under subpart F. I'm just taking my colleague's word for it on that, but that's what he says. So it wouldn't be taxable under subpart F, and Notice 8921 would apply and would dictate exactly how. So this was done to comply with the law, not to evade the law. That's a clear distinction, and the key thing here is that they were doing something real. Normally, transactions like this, especially of this magnitude, are presented, I understand, to the Board of Directors, but the Board of Directors was sidestepped in this case. Well, and there was evidence on that, Your Honor, and what the witness said is that was a new policy, and one of two things either happened. Either they didn't comply with the policy or they didn't think the policy applied. Now, admittedly, that's a fact, but the question is, does that change the substance? How is it that this thing that is formally denominated as a sale, which everybody involved wanted to be a sale, becomes a loan because it's not presented to the Board of Directors? It doesn't. The question here for the district court and the question for this court is, what is the substance? And the substance here was exactly the same as the form, and you can't recharacterize something whose form is a sale into a loan based on attributes that are consistent with its form, and I submit that every single one of the attributes that the district court relied on are consistent with the sale of a swap received leg. The subsidiaries had exactly what Notice 8921 governs. They had a right to receive future payment streams from ABN, an independent party, that were based on a floating future interest rate going out 20 years into the future. That's an asset. That's something that they hoped to get back their money. They didn't know they would. It's not a loan. There was no legal obligation. Shearing Plow didn't want to have a legal obligation to pay back its subsidiaries. It knew if it had a legal obligation to do that, it would owe all this tax. That's why they didn't want to do it, Your Honors. And on the disparate treatment claim, if I can just briefly address that. The problem here is not the IRS is allowed to correct its mistakes, and it's allowed to even retroactively correct its mistakes, but what it can't do is what it did here, and that is treat two taxpayers at the same time differently. At Brunswick, they still had six years after this case was filed, even after this case was filed. They had six years after they determined in Shearing Plow's case to go and tax Brunswick. They never did. Thank you, Your Honor. Mr. Franklin, thank you very much. Ms. Hagley, thank you. Yes, we're going to need a transcript of the argument in this case. I'd ask the parties to speak to the clerk and make arrangements. You can divide the cost. Thank you very much.